**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0753n.06

Case No. 14-1105

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 30, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LAI MING CHUI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| PATRICK DONAHOE, | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

**BEFORE: GUY, ROGERS, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.** Lai Ming Chui, an employee of the United States Postal Service ("Postal Service"), filed this action against Patrick Donahoe, the Postmaster General, alleging that her placement on standby status in June 2009 was based on race and national origin discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq*., and disability discrimination and failure to accommodate in violation of the Rehabilitation Act, 29 U.S.C. § 791 *et seq.* The parties filed cross-motions for summary judgment. The district court denied Chui's motion for partial summary judgment on her failure to accommodate claim, and granted summary judgment in favor of the Postal Service on all of Chui's claims. We **AFFIRM**.

I.     BACKGROUND

Chui, who was born in China and moved to the United States when she was eighteen years old, began working with the Postal Service in September 1998 as a part-time, flexible flat sorter operator at the Kalamazoo Processing and Distribution Center ("PDC"). In November 2001 Chui became a mail processing clerk, a "bid assignment" that Chui received through the seniority-based provisions of her union's collective bargaining agreement. In this assignment, Chui continued to perform duties similar to those of a flat sorter operator: working as a machine operator to sort and process mail. Mail processing clerk is an official Postal Service position involving a variety of clerical duties required for processing mail using automated equipment or manual methods of sorting and distribution. The position requires significant physical labor, including: standing and walking up to eight hours per day; lifting and carrying up to 70 pounds intermittently for up to eight hours per day; intermittent climbing, kneeling, twisting, bending or stooping, pulling or pushing, and reaching above the shoulder for up to four hours per day; and intermittent grasping for up to six hours per day.

On December 31, 2001, Chui suffered a work-related injury. She filed a claim for worker's compensation benefits with the Federal Office of Worker's Compensation Programs ("OWCP"). The OWCP granted Chui's claim as a left shoulder, trapezius strain—although medical records indicate that Chui had cervical disc disease. Chui returned to work in June 2002, but was unable to perform her regular duties. In accordance with the Postal Service's then-practice of providing temporary work for employees recovering from work-related injuries, the Postal Service provided Chui with a "limited-duty assignment." In March 2003, a physician determined that Chui had reached maximum medical improvement and that her condition was permanent. The physician provided specific restrictions to Chui's physical duties, limiting her to

reaching, twisting, and lifting for no more than two hours per day; carrying 15 pounds frequently; and lifting or carrying 30 pounds occasionally. These restrictions remained in effect throughout the remainder of Chui's employment. Because of her restrictions, Chui could not perform the essential duties of a mail processing clerk or those of any other vacant funded positions or bid assignments within the Postal Service.

Prior to 2008, it was the Postal Service's practice to keep employees, with permanent work-related injuries who could not perform their regular duties, "on the clock" by providing them with rehabilitation assignments rather than paying the employees worker's compensation payments they would have been entitled to if they did not work. Rehabilitation assignments were offered to an employee who had suffered a work-related injury and who had reached his or her maximum medical improvement, or who suffered a permanent injury. These rehabilitation assignments were not vacant funded positions. Rather, they were generally created assignments that involved a variety of duties, including duties that would otherwise be performed by other employees as part of the regular duties of their positions.

In accordance with this practice, the Postal Service provided Chui with a rehabilitation assignment in June 2003, a second assignment in February 2004, and a third in July 2007. These assignments were specifically created for Chui because she could not perform the essential duties of her mail processing clerk position. However, while performing these assignments, Chui retained the title, salary, and benefits of a mail processing clerk. Beginning with the February 2004 assignment, Chui spent her day as a "helper," performing clerical work that supervisors and managers ordinarily would have performed. Specifically, Chui processed union requests, processed employee leave forms, recorded employee schedules, prepared holiday schedules, made placards and photocopies, typed documents, and performed other forms of clerical work in

the supervisors' office. Again, these tasks were not the duties of any specific position, as there was no general "clerk" or "office worker" position available at the Kalamazoo PDC.

The Postal Service has experienced financial difficulties in recent years, due to the diversion of paper mail to electronic mail. The Postal Service has responded to these challenges by reducing employee work hours to correspond to the reduction in mail volume. Additionally, the Postal Service developed the National Reassessment Process ("NRP") to ensure that all employees were performing work that was "necessary and productive," and to end the practice of keeping employees "on the clock" by creating prolonged work assignments for those injured on the job. As part of the NRP, the Postal Service directed each postal facility to identify necessary and productive work that was available in the facility — i.e., work that was not already held by a bid-assigned employee, and that was available on a consistent, daily basis. The NRP also required that managers at each facility assess employees with limited-duty or rehabilitation assignments in order to determine whether those employees were performing necessary and productive work.

In April 2009, Linda Woods became the Acting Plant Manager at the Kalamazoo PDC. Woods and other employees or managers from outside the facility, as part of the NRP, reviewed the files of all limited-duty employees and arranged for time studies of assignments that appeared to involve work that was not necessary. In May 2009, Kasse Morris performed time studies of a number of limited-duty employees, including Chui. Morris' time study consisted of following Chui and observing the tasks she performed. Morris concluded that Chui was not performing necessary and productive work as a "helper," because Chui was largely performing duties that her supervisors and managers were required to perform.

Woods then directed all supervisors and managers in the facility to place employees who were not performing necessary and productive work on "standby" until there was appropriate work available. John Priest, the facility's Manager of Distribution Operations and Chui's supervisor, thereafter placed Chui on standby effective June 17, 2009. While on standby, employees could sit in a conference room or walk around the facility. Standby employees were able to watch television or read personal reading material during work hours. These employees also received their regular salary and benefits.

Chui claims to have been stigmatized and embarrassed by being placed on standby. She testified that other employees laughed at and denigrated her, calling her names like "freeloader." Chui eventually sought psychological counselling. In September 2009, Chui filed a formal EEOC complaint asserting race, national origin, and disability discrimination as a result of being placed on standby on June 17, 2009. Eventually, Chui was offered, and accepted, an appropriate limited-duty assignment. Thus, from November 3, 2009 to July 14, 2010, Chui performed quality control checks and other duties for four hours, and then returned to standby for the remaining four hours of her work shift.

The NRP required that a search for necessary and productive work within applicable medical restrictions be conducted for limited-duty employees who were not previously performing necessary and productive work. The search was first directed at the facility in which the employee worked, and secondly at locations within 50 miles of that facility. If there was no necessary and productive work available, then the employee would be instructed how to apply for OWCP compensation and then sent home. On July 14, 2010, an NRP team met with Chui and gave her a "complete day no work letter," which informed her that the search had found no necessary and productive work within her restrictions.

Chui did not contact the EEOC or file a formal complaint asserting discrimination arising out of her being sent home on July 14, 2010. Rather, Chui argues that she should have been sent home in June 2009, rather than placed on standby. This appeal, therefore, only concerns Chui's placement on standby status from June 17, 2009 to July 14, 2010 — a period of time during which Chui received her regular salary and benefits, but performed, at various times, no duties or only four hours of work per day.

## II.      STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009) (citing *Miller v. Admin. Office of the Courts,* 448 F.3d 887, 893 (6th Cir. 2006)). The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We view factual evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).

## III.      ANALYSIS

### A.

To establish a prima facie case of failure to accommodate, a plaintiff must show: (1) she is an individual with a disability, (2) she is qualified for the position, (3) her employer was aware of her disability, (4) accommodation was necessary because of the disability, and (5) the employer failed to provide the necessary accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419

(6th Cir. 2004) (quoting *Gaines v. Runyon,* 107 F.3d 1171, 1175-76 (6th Cir. 1997)). At summary judgment and on appeal, the primary point of contention has been what Chui's position was, and whether Chui was "qualified" to perform the requirements of that position. Chui's claim that the district court erred in denying summary judgment on her failure to accommodate claim appears to be premised on two contentions. The first is Chui's contention that, in June 2009, her position was defined by the duties of her rehabilitation assignment. The second is Chui's contention that her manager had no authority to terminate that assignment because the Postal Service did not change its policy and practice of creating assignments not involving necessary and productive work until July 2010. Chui is incorrect on both accounts.

The district court correctly found that Chui's official position with the Postal Service, since November 3, 2010, was that of a mail processing clerk. Chui repeatedly avers, however, that her official position was her "permanent rehabilitation assignment." There is no factual support for Chui's contention. It is uncontroverted that Postal Service rehabilitation assignments were not, as Chui claims, permanent positions. Chui therefore remained classified as — and received the salary and benefits of — a mail processing clerk even after she assumed different daily responsibilities following her injury. The only evidence Chui cites to support her claim that she was *not* a mail processing clerk is a single attendance report which refers to a particular code, "5540," with respect to Chui. The record demonstrates that this code denotes "office work." "Office work" is not an official position, however, and it is undisputed that, at that time, there was no clerical or office worker position available at the Kalamazoo PDC.

Chui next claims that, even assuming that her official position was mail processing clerk, the Postal Service still failed to accommodate her disability because the law requires an analysis as to "what the employee's job really was (the essential job duties), not what the official job title

was [sic]." *See* 29 C.F.R. § 1630.2(n)(1) ("The term essential functions means the fundamental job duties *of the employment position the individual with a disability holds* or desires.") (emphasis added). This argument is unpersuasive, again because the position Chui officially "held" was mail processing clerk. The duties Chui was actually performing are therefore irrelevant.

We are also unpersuaded by Chui's contention that the district court's finding that she was a mail processing clerk contradicts our holding in *Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007). *Jones* involved a charge of discrimination based on disability brought by a discharged employee of the Postal Service. In that case, we found that factual issues regarding whether the plaintiff had presented a prima facie case of discrimination precluded summary judgment in favor of the Postal Service on that basis. *Id.* at 406. In *Jones*, as here, there was some dispute as to what the employee's job position was for purposes of the "otherwise qualified" prong of the prima facie test for disability discrimination. There, as here, the Postal Service argued that the employee's permanent position was the employee's official job title, and not the employee's rehabilitation assignment. We rejected this argument in *Jones*, finding that the evidence provided some support for the conclusion that the plaintiff's rehabilitation position (as a "torn-mail handler") was his permanent position at the time he was fired. *Id.* at 405.

Unlike the facts in *Jones*, here the record is clear that Chui maintained the position of mail processing clerk throughout her rehabilitation assignment. Further, although it is not entirely clear from the *Jones* opinion, it appears that the position of torn-mail handler may have been a vacant funded position at the Postal Service facility in that case.[1] Here, the record

---

[1]Although Chui cites *Jones* as precedential authority for her failure to accommodate claim, *Jones* did not involve a claim for failure to accommodate. Jones was discharged following an altercation with another Postal Service employee. An arbitrator subsequently determined that Jones' dismissal was disproportionately harsh, especially in light of the fact that the other employee involved in the altercation was only placed on administrative leave with pay.

establishes that there was no vacant funded position for the clerical work Chui was performing during her rehabilitation assignment. Chui is therefore incorrect in asserting that the district court "clearly erred both by exalting a job title over the required functional analysis" of Chui's actual job duties. The flaw in Chui's argument is not limited to the fact that she formally retained the title of mail processing clerk during her rehabilitation assignment. The problem is also that Chui has not identified a vacant funded position covering the activities she performed during her rehabilitation assignment.

Based on the foregoing, we agree with the district court that Chui's position, for purposes of the Rehabilitation Act, was mail processing clerk. Further, it is undisputed that Chui could not perform the essential duties of the position of mail processing clerk with or without reasonable accommodation. Because there is no accommodation which would enable Chui to perform the essential duties of a mail processing clerk, in order to overcome summary judgment Chui was required to identify a vacant funded position for which she was qualified and the essential functions of which she could perform with or without reasonable accommodation. *See, e.g.*, *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869-70 (6th Cir. 2007); *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004). Chui has failed to meet this burden.

Chui concedes that employers have no duty under the Rehabilitation Act to either create a position for an employee, *see Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1025 (6th

---

Following the arbitrator's ruling, Jones was reinstated with backpay for all but 30 days of wages and benefits lost during his unemployment. Nonetheless, Jones filed suit against the Postal Service, alleging that his termination was due to improper motives relating to his race, gender, physical disabilities, and prior litigious activity against the Postal Service. On appeal before this Court, *Jones* only involved the employee's claim of disability discrimination.

Accordingly, the *Jones* opinion is unclear as to whether the positon of torn-mail handler was Jones' permanent position because that was not the central issue in that case. The central issue was whether Jones' termination was disproportionately harsh because of his disability. The *Jones* Court did not engage in a fact-intensive inquiry into what Jones' position was, and whether the Postal Service failed to accommodate him, because there was little need to do so on the facts of that case. Additionally, even though we determined that factual issues precluded summary judgment on the issue of whether Jones had made out a prima facie case, Jones' disability discrimination claim still failed because he could not establish unlawful pretext for disability discrimination under the *McDonnell Douglas* framework.

Cir. 2013), *reh'g denied* (Feb. 10, 2014) (internal citations omitted), or continue providing an accommodation that it has voluntarily provided, *see Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir.1999). Nevertheless, Chui argues that the Postal Service had no authority to remove her from her rehabilitation assignment at least until the NRP was implemented in July 2010. Chui does not claim that the Rehabilitation Act precluded the Postal Service from discontinuing its prior practice of providing assignments to employees with permanent limitations as a result of job-related injuries, regardless of whether the assignments involved necessary and productive work. Rather, she merely contends that the Postal Service could not have done so until July 2010. Chui offers no legal or factual support for this proposition, however. Specifically, Chui has cited no evidence that the policy change represented by the NRP went into effect on a particular date. On the contrary, the record demonstrates that the National Reassessment Process, as its name suggests, was ongoing and not limited to a specific date. At the Kalamazoo PDC, the process began with the arrival of Woods in April 2009. Chui also has not cited any evidence that the NRP precluded Woods from placing employees like Chui on standby, or partial standby, prior to a particular date.

For these reasons, Chui's citation of *Woodman v. Runyon*, 132 F.3d 1330 (10th Cir. 1997) and *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273 (1987), is also unavailing. The portions of *Woodman* cited by Chui stand only for the unremarkable proposition that a factual dispute exists when an employer accommodates a similarly situated employee to a voluntarily created position, but does not accommodate another employee. *Woodman*, 132 F.3d at 1346. Here, however, Chui has neither identified an appropriate vacant funded position that she was qualified for or could perform the essential duties of, nor has Chui identified another limited-duty employee who was offered an accommodation she was not offered. Likewise, the portion

of *Arline* emphasized by Chui stands only for the proposition that an employer "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *Arline*, 480 U.S. at 289 n.19. Here, however, the policy that Chui's argument relies on was being phased out, and Chui has not demonstrated that the Postal Service was under any obligation to maintain the policy for any particular period of time.

B.

In cases involving disability discrimination claims, where a plaintiff presents direct evidence that his or her employer relied on his or her disability in making an adverse employment decision, the plaintiff bears the burden of establishing the following: (1) that she is disabled, and (2) she is "otherwise qualified" for the position despite the disability (a) without accommodation, (b) with the elimination of an allegedly essential job requirement, or (c) with a proposed reasonable accommodation. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). The employer then bears the burden of establishing that the challenged job requirement is essential and is therefore a business necessity, or that the proposed accommodation would impose an undue hardship on the employer. *Id.*; *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir. 1993) ("Direct evidence of discrimination allows a plaintiff to proceed without meeting the requirements of a *prima facie* case set forth in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)].") (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) and *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991)).

In this case, Chui presented direct evidence that Woods discriminated against her because of her disability. For instance, Chui presented testimony from her supervisors suggesting that

Woods had a problem with people on limited-duty assignments. The district court considered these alleged statements by Woods, and correctly concluded that these statements, while clearly suggesting that Woods considered Chui's disability in making the employment decision, do not automatically conclude a court's analysis. Direct evidence of discrimination dispenses with the requirement that a plaintiff satisfy the familiar *McDonnell Douglas* burden-shifting framework. It does not, however, relieve Chui of her burden of satisfying the two elements set forth above. *Monette*, 90 F.3d at 1186.

Ultimately, Chui's disability discrimination claim fails for the same reason her failure to accommodate claim fails: she has not established that she is a qualified individual with a disability because she could not perform the essential duties of her mail processing clerk position with or without a reasonable accommodation. Chui advances no arguments that she would have been qualified for this position with the elimination of an allegedly essential job requirement, or with a proposed, reasonable accommodation.

## C.

A plaintiff seeking to establish that an employer discriminated against her on the basis of race or national origin, in violation of Title VII, must first present a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Terbovitz v. Fiscal Court of Adair Cnty., Ky.*, 825 F.2d 111, 114-15 (6th Cir. 1987) (citing *Trans World Airlines*, 469 U.S. at 121), or by showing the existence of circumstantial evidence which creates an inference of discrimination, *McDonnell Douglas*, 411 U.S. at 802. Under the latter approach, the plaintiff must show that: (1) she is a member of a protected group, (2) she was subjected to an adverse employment decision, (3) she was qualified for the position,

and (4) she was replaced by a person outside of the protected class. *McDonnell Douglas*, 411 U.S. at 802; *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Mitchell*, 964 F.2d at 582-83. Once the plaintiff has established a prima facie case, which creates a presumption that the defendant unlawfully discriminated against the plaintiff, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981); *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 265 (6th Cir. 1986). If the defendant offers a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the discrimination was a determinative factor in the defendant's decision. *McDonnell Douglas*, 411 U.S. at 804-05.

The district court properly granted summary judgment to the Postal Service on Chui's Title VII claim because Chui has not established a prima facie case of discrimination. For the reasons previously discussed, the third element of a prima facie case is not met because Chui has not demonstrated that she was qualified for the position of mail processing clerk, and the rehabilitation assignment Chui sought to retain was not a vacant, funded position. Additionally, even assuming that the nature and quality of being placed on standby is sufficient to constitute an adverse employment action (the second element), Chui cannot establish that she was treated any differently than similarly situated individuals (the fourth element). Accordingly, Chui has not satisfied the second, third, or fourth elements of a prima facie case of Title VII discrimination.

The record demonstrates that seven non-Asian, non-Chinese employees that Chui asserts were treated differently—Mary Portaro, Sarah Brown, Pam Stenger, Patricia Bolen, Shirley Gurnee, Anthony Riccio, and Joseph Simmons—were also placed on standby. In an attempt to

undermine the fact that these alleged comparators were treated no differently than she was, Chui makes a number of arguments that are all without merit. We first note that Chui's allegation that Woods "did not like her," which is arguably supported by the testimony of other employees, does not necessitate the conclusion that Woods' attitude toward her was the result of discriminatory bias.

Further, Chui's assertion that the timing and length of other employees' standby status differed from her own, also does not produce an inference of discrimination. For example, Chui argues that Stenger, Bolen, Gurnee, and Riccio are white, like Woods, and that they remained in their rehabilitation assignments while Chui was placed on standby. The record establishes, however, that Simmons (also not a member of Chui's protected class) was placed on standby *before* Chui, and that he remained on standby for a longer period of time than Chui.

Chui attempts to undermine this fact by arguing that Simmons was offered the opportunity to "do what another employee was doing" before he was placed on standby. But the fact that Simmons was offered another assignment is of little moment. The record demonstrates that Chui was offered two limited-duty assignments after being placed on standby. Chui rejected the first offer on the grounds that it was outside her medical restrictions, and accepted the second offer — which ultimately led to her being on partial standby from November 3, 2009 to July 14, 2010. It therefore cannot be said that Chui was treated differently from Simmons in either being placed on standby, or being offered other assignments in lieu of remaining on standby.

Chui then attempts to differentiate her treatment from that of Stenger, Bolen, Gurnee, and Riccio by claiming that they were placed on "temporary" standby while she was placed on "permanent" standby. We first note that this argument implicitly requires Chui to liken her treatment to Simmons' treatment, even though she has, at other times, inconsistently argued that

Simmons was treated more favorably than she was. Moreover, Chui's classification of "temporary" and "permanent" standby is entirely self-created. The reason limited-duty employees were placed on standby was because the Postal Service determined that there was no necessary and productive work for them to perform. The reason that these limited-duty employees were removed from standby was because the Postal Service was able to identify necessary and productive work for them to perform. The fact that the other employees Chui identifies may have been on standby for less time than Chui merely suggests that locating necessary and productive work within their respective medical restrictions was less difficult. Conversely, the fact that Simmons remained on standby *after* Chui was placed on partial standby suggests that his medical restrictions were more limiting than Chui's medical restrictions. Chui's standby status itself was not even "permanent," as it is clear that she was removed from such status once necessary and productive work within her medical restrictions was found, and she was then placed on partial standby.

Finally, Chui's attempt to characterize her Title VII claim as a "mixed motive" case does not alter our analysis. Mixed motive claims are those where the employment decision is made for both legitimate and illegitimate reasons. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 711 (6th Cir. 2006)). Chui has presented no evidence that race or national origin played a role in the Postal Service's decision to place her on standby. Because Chui has presented no evidence of illegitimate motive, analysis of her claim under the mixed motive standard would be improper.

## IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.